UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

GIVAUDAN SA,

                          Plaintiff,

    v.

CONAGEN INC.,

                       Defendant.

_____

Civil Action No. 18-cv-03588 (JGK)


## PLAINTIFF GIVAUDAN SA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW


GOLDBERG SEGALLA LLP

Christopher J. Belter
Ryan G. Pitman
*Attorneys for Plaintiff*
*Givaudan SA*
665 Main Street
Buffalo, New York 14203-1425
Phone: 716.566.5400
Fax:   716.566.5401
cbelter@goldbergsegalla.com
rpitman@goldbergsegalla.com

# Table of Contents

INTRODUCTION ...................................................................................................................1

FINDINGS OF FACT............................................................................................................1

I. Findings of Undisputed Facts ........................................................................................1

II. Givaudan's Proposed Additional Findings of Fact .....................................................5

    A. The October 2016 Givaudan Board Presentation .........................................5

    B. The Parties' September and October 2016 Exchanges ..................................6

    C. Events Subsequent to Givaudan's June 26, 2017 Demand Letter ...............16

CONCLUSIONS OF LAW ...................................................................................................17

    A. Breach of Contract .........................................................................................18

    B. Promissory Estoppel ......................................................................................23

    C. Unjust Enrichment .........................................................................................24

    D. Interest ...........................................................................................................27

33224622.v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandywine Smyrna, Inc. v. Millennium Builders, LLC,*
   34 A.3d 482 (Del. 2011) ..........................................................................................................28

*Carlson v. Hallinan,*
   925 A.2d 506 (Del. Ch. 2006)...................................................................................................19

*Certainteed Corp. v. Celotex Corp.,*
   2005 Del. Ch. LEXIS 11 (Del. Ch. Jan. 24, 2005) ..................................................................18

*Chrysler Corp. v. Chaplake Holdings, Ltd.,*
   822 A.2d 1024 (Del. 2003) .......................................................................................................23

*CIGNEX Datamatics, Inc. v. Lam Research Corp.,*
   No. 17-320 (MN), 2021 U.S. Dist. LEXIS 10771 (D. Del. Jan. 21, 2021) .............................28

*Comrie v. Enterasys Networks, Inc.,*
   837 A.2d 1, 14 (Del. Ch. 2003)................................................................................................19

*Greenstar IH Rep, LLC v. Tutor Perini Corp.,*
   2019 Del. Ch. LEXIS 1380 (Del. Ch. Dec. 4, 2019) ...............................................................19

*Harmon v. Del. Harness Racing Comm'n,*
   62 A.3d 1198 (Del. 2013) .........................................................................................................24

*Nemec v. Shrader,*
   991 A.2d 1120 (Del. 2010) .......................................................................................................24

*Ramone v. Lang,*
   Del. Ch. LEXIS 71 (Del. Ch. Apr. 3, 2006) ............................................................................18

*Schipani v. McLeod,*
   541 F.3d 158 (2d Cir. 2008)......................................................................................................27

*SIGA Techs., Inc. v. PharmAthene, Inc.,*
   67 A.3d 330 (Del. 2013) .....................................................................................................18, 23

*Whittington v. Dragon Grp., L.L.C.,*
   2011 Del. Ch. LEXIS 63 (Del. Ch. Apr. 15, 2011) .................................................................19

**Statutes**

Del. Code Ann. tit. 6, § 2301 .........................................................................................................28

**INTRODUCTION**

Plaintiff Givaudan SA, (hereinafter "Givaudan"), by and through its attorneys, Goldberg Segalla LLP, submits these Proposed Findings of Fact and Conclusions of Law pursuant to the Court's individual practices and orders of July 30, 2021, October 14, 2021, and February 7, 2022, in advance of the bench trial scheduled to commence June 6, 2022.

**FINDINGS OF FACT**

**I.**   **Findings of Undisputed Fact**

For the sake of context and completeness, Givaudan recites the following undisputed facts as determined by the Court in rendering its decision at the summary judgment phase:

1.      Givaudan is a manufacturer of flavors, fragrances, and active cosmetic ingredients.

2.      Defendant Conagen Inc. ("Conagen"), a Massachusetts corporation with a principal place of business in Massachusetts, is in the business of researching and developing bio-manufacturing processes and techniques.

3.      Juerg Witmer is the former chairman of the board of directors for Givaudan until he retired in March 2017.

4.      Christian Thoen is the former Head of Science and Technology for the Flavors Division of Givaudan.

5.      Roberto Garavagno is in-house group legal counsel for Givaudan.

6.      Steven Chen is the president of Conagen. Holly You served as in-house legal counsel for Conagen.

7.      On July 3, 2015, Conagen and Givaudan entered into a stock purchase agreement ("SPA") pursuant to which Givaudan invested $10 million in Conagen in exchange for a five-percent equity interest in Conagen. The companies had subsequent discussions about Givaudan

1

making additional investments in Conagen and in two of its affiliates, Anhui Longjin Biotechnology Co., Ltd. ("Anhui") and Sweegen International Limited ("Sweegen").

8.    On September 12, 2016, Witmer sent an email to Chen stating "[L]et me reiterate that Givaudan, and I personally, are committed to expanding our long term relationship . . . on Conagen, Anhui and Sweegen. However, the [memorandum of understanding] under discussion between [the companies' counsel] still needs some further work . . . . In order to show our commitment I am perfectly happy to sign a term sheet on Conagen as per the attachment together with you when we meet next Thursday in San Francisco and to effect the additional equity payment for Conagen immediately."

9.    On September 15, 2016, Conagen, its affiliate Phyto Tech Corp ("Blue Cal"), and Givaudan executed a term sheet. The Term Sheet provided that "[t]he parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties."

10.    The Term Sheet listed six "Key Terms":

1. Givaudan will invest an additional $10 million for an additional 5 percent of Conagen, based upon a $200 million evaluation from the 2015 Givaudan/Conagen deal. Conagen will adjust its management structure to include legal/finance, CSO and office and regulator managers, and securing confidentiality and non-compete agreements from its CSO Oliver Yu and CEO Steven Chen.

2. Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to Givaudan.

3. The parties will agree on licensing terms for the commercial exploitation of the specified IP by Givaudan.

2

4. The parties will discuss in good faith separately whether and at which conditions further investments in Blue California Group companies may be made.

5. The confidentiality obligations agreed between the parties in the Limited Liability Company Agreement of BGN Tech (dated 21.02.2014) shall apply to the parties and be integrated hereto by reference.

6. The law and jurisdiction clauses agreed between the parties in the Limited Liability Company Agreement of BGN Tech (dated 21.02.2014) shall apply to the parties and be integrated hereto by reference.

11.     Following the execution of the Term Sheet, Givaudan transferred $10 million to Conagen. The parties continued negotiations after the execution of the Term Sheet through at least November 2016.

12.     On October 13, 2016, You, Conagen's in-house legal counsel, emailed Garavagno, Givaudan's in-house legal counsel, drafts of several agreements. In response, on October 28, 2016, Garavagno rejected certain terms proposed by You, stating "Givaudan cannot be obligated to develop Proof of Concept technologies instead of Conagen or lose exclusivity. Givaudan must have the possibility to do so but it cannot be an obligation. Such development is in principle Conagen's task. Doing otherwise has the potential to void the exclusivity of any meaning. Our investment in Conagen is there to secure exclusivity on such potential technologies."

13.     Givaudan claims that this objection was consistent with the Term Sheet's Key Term Two, which states that "[e]xclusivity will convert to non-exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent." This, Givaudan claims, was also in contrast with an earlier draft of the Term Sheet included in Witmer's September 12, 2016 email, which stated that "[e]xclusivity will convert to non-

exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, or develop concept IP."

14.     In early November 2016, Thoen informed Chen that Givaudan would not be making an equity investment in Conagen's affiliates, Sweegen and Anhui.

15.     On November 7, 2016, Conagen's outside counsel informed Givaudan's outside counsel that his client instructed him to stand down on the efforts to negotiate agreements under the Term Sheet. On the same day, You told Garavagno that Givaudan's investment in Conagen was "put on hold."

16.     On November 8, 2016, Garavagno informed Thoen and Witmer that, according to You, Chen viewed Givaudan's investment as part of a three-investment package deal including Sweegen and Anhui, and that Givaudan's decision not to invest in those companies would require a fundamental review of the investment terms, including the exclusivity provisions.

17.     On December 1, 2016, Chen sent an email to Mauricio Graber and Thoen, summarizing a phone call among them, to which Graber replied that "Givaudan is a 10 percent equity investor of Conagen" and that they needed to discuss "right of first refusal versus exclusivity." Thoen and Chen continued to be in constant contact through February 2017.

18.     On May 10, 2017, Conagen sent stock certificates to Givaudan representing the second five-percent equity stake in Conagen. On May 11, 2017, Garavagno emailed You stating "I am quite surprised to receive this stock certificate. Our 10 million USD advance was meant to cover a second issue of shares based on the signature, at the same time, of an acceptable SPA and certain agreements relating to IP. . . . Our second investment in Conagen was very clearly linked to these IP deals, which for the moment, are still not completed."

19.     The email further stated that Givaudan "reserve[d] all [of its] rights with respect to this matter, and in particular the right to refuse this second capital increase and to claim back the payment of the 10 million USD advance."

20.     Nonetheless, the parties agree that through May 2017, the negotiations between Givaudan and Conagen were ongoing.

21.     On June 26, 2017, Garavagno wrote a letter to Chen stating "we reject the purported issuance of equity without agreement and definitive documentation regarding both the Equity Investment and the IP Rights and demand the immediate return of the Advance to us."

22.     Thoen testified that he is not aware of any documents that referred to the $10 million as an "advance" prior to the May 11, 2017 email from Givaudan's counsel. In an internal Givaudan board presentation, a slide stated that "Givaudan's Board of Directors is informed that another 5 percent stake for $10,000,000 has been acquired."

23.     Ultimately, the parties never finalized nor executed any written agreement as contemplated under the Term Sheet. To date, Conagen has not returned the $10 million payment to Givaudan, and Givaudan currently has possession of the Conagen stock certificates.

## II.    <u>Givaudan's Proposed Additional Findings of Fact</u>

### A.    The October 2016 Givaudan Board Presentation

24.     The October 2016 Givaudan Board presentation slide that stated Givaudan had obtained another 5 percent stake in Conagen (*see supra* ¶ 22) also said, "The equity stake gives Givaudan (i) exclusivity for Flavours, Fragrances and Active Beauty on Conagen's existing and future IP (product and technology platform), (ii) non-competes from Steven Chen and Oliver Yu, and (iii) a position on Conagen's Science Advisory Board."

25.    Thoen testified that he prepared the presentation slides and stated the additional equity in Conagen in the past tense based on his anticipation and assumption that Givaudan and Conagen would reach written agreements based on the Term Sheet.

26.    Thoen further testified that he listed equity, IP exclusivity, non-competes, and a position on Conagen's Science Advisory Board together because Givaudan viewed them as interdependent.

**B.    The Parties' September and October 2016 Exchanges**

27.    Thoen testified that, apart from the Conagen-related issues, the parties continued after execution of the Term Sheet to discuss separately the possibility of additional investments by Givaudan in other Chen-related companies. This testimony is not credibly disputed.

28.    On September 9, 2016, prior to the parties' execution of the Term Sheet, You sent Garavagno an email enclosing a number of draft agreements, which she characterized as "the COMPLETE package of all documents updated from Paul Weiss' 2015 set of drafts."

29.    Garavagno explained that the Paul Weiss firm, as outside counsel to Givaudan, had prepared this set of documents after Givaudan's acquisition of the initial 5% of Conagen's equity in anticipation of a potential further investment in Conagen.

30.    Among the attachments were a draft stock purchase agreement ("Draft SPA"), a draft exclusivity agreement" (the "9/9 Draft Exclusivity Agreement"), and a draft memorandum of understanding ("9/9 Draft MOU").

31.    As to the 9/9 Draft MOU, You stated in her transmittal email: "this was reviewed by Chris [Thoen] and Chairman [Juerg Witmer]. To my knowledge Steven and Chairman are to sign this very shortly."

32.    Item 1 of the 9/9 Draft MOU stated in full:

Givaudan will invest an additional $10 M for an additional 5% of Conagen, based upon a $200 M evaluation from the 2015 Givaudan/Conagen deal. Conagen will adjust its management structure to include legal/finance, CSO and office and regulator managers, and securing confidentiality and non-compete agreements from its CSO Oliver Yu and CEO Steven Chen for 2 years (renewable upon conditions met). ***Conagen will provide Givaudan with exclusivity to Conagen's Specified IP (either in concept or mature) for F&F for 12 months, which will convert to non-exclusivity should Givaudan fail to scale up to an industrially viable extent within such 12 months.***

(Emphasis added.)

33.    As to the 9/9 Draft Exclusivity Agreement, You described three "[m]ain

revisions:

(a) Conversion to non-exclusivity: ramp up period remains as 12 months from the agreement date ***but the goal should be commercialization to scaled up to an industrially viable point. Failure to achieve such goal within such 12 months will result in conversion to non-exclusive license*** (upon 2 months' notice by Conagen).

(b) 'irrevocable' is deleted.

(c) Conagen Concepts IP vs. Conagen Fully Developed IP: ***I expanded this to include Givaudan's first right to engage Conagen for push concepts to commercialization ready (fully developed IP),*** according to the deal points desired by Chris confirmed in writing. This may be quite a bit of addition so I am happy to discuss over the phone with you."

(Emphasis added.)

34.    Section 2(b) of the 9/9 Draft Exclusivity Agreement, which as You stated in her

email was a marked-up revision to the Paul Weiss 2015 drafts, was as follows:

7

(b)      Upon the discovery, invention, development, creation, acquisition, or in-licensing of any Specified IP by the Company or its Affiliates (including BGN), each of the Company and BGN, as applicable, shall grant and does hereby grant to Investor, to the fullest extent of its respective rights therein and for the duration of the term of this Agreement, a worldwide, exclusive, irrevocable (during the term of this Agreement), license to Commercially Exploit the Specified IP in connection with any products or services within the Fields, which license shall be fully-transferable and fully-sublicensable to Investor's Affiliates (the "Specified IP License").  Within a period of sixty (60)thirty (30) days or a reasonable amount of time as mutually agreed by the Company and Investor in writing[1] from the date on which Investor receives the Creation Notice (the "Agreement Period")., the Company and Investor shall enter into

(i)      if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Proof of Concepts Specified IP in the Fields, the Company and Investor shall enter into (x) a research agreement for the Company to further develop the Proof of Concepts Specified IP in the Fields upon Investor's provision of reasonable compensation for the Company's to-date investmetsinvestments in such IP and reasonable funding for further research (the "Proof of Concepts R&D Agreement") for which the research results, including possibly converting Proof of Concepts Specified IP to Fully Developed Specified IP, are to be owned Investor unless the Parties otherwise agree in writing and (y) a written license agreement in a form substantially similar to that set forth on Exhibit A hereto (the "Specified IP License Agreement"). The Proof of Concepts R&D Agreement shall provide that, amongst other things, the Company shall have the first right (but not the obligation) to exclusively CommericiallyCommercially Exploit the converted Fully Developed Specified IP at a royalty rate of 10% of the Company's Net Sales world-widely of any products utililzingutilizing such converted Fully Developed Specified IP with other reasonable terms and conditions the Parties may agree to in writing;

If, within the Agreement Period, Investor in writing notifies the Company its intent not to conclude or the Parties are unable to agree on the terms and conditions of the Proof of Concepts R&D Agreement, then no Specified IP License Agreement will be concluded and the Company shall have the right perform further research alone or jointly with any other Person(s).

(ii)      if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Fully Developed SpecifedSpecified IP in the Fields but not as a result from the Proof of Concepts R&D Agreement, the Company and Investor shall enter into the Specified IP License Agreement in a form substantially similar to that set forth on Exhibit A. If, within the Agreement Period, Investor in writing notifies the Company its intent not to Commercialize such IP as disclosed in the Creation Notice,  then no Specified IP License Agreement will be concluded Field and the Company shall have the right to Commercialize such IP or license to other Person (s).

8

~~(b)~~   Notwithstanding anything herein to the contrary, and as set forth more fully in each Specified IP License Agreement, Investor agrees to _use Commercially Reasonable Efforts to Commercially Exploit any Fully Developed Specified IP _-licensed to it under the applicable Specified IP License ~~following to an extent~~scaled up to an extent that is ~~that is vialble~~~~viable industrially~~~~industrially~~industrially viable within ~~point within~~ the Ramp Up Period; provided, that in the event Investor or its Affiliates ~~(ix)~~-fails ~~to use Commercially Reasonable Efforts~~ to Commercially Exploit such Fully Developed Specified IP ~~to an~~scaled up to  an extent that is viable industrially within the Ramp Period, ~~or (iiy) where such Fully Developed Specified IP is Commercially Exploited and scaled up to an extent that is viable industrially~~  by Investor or its Affiliates ~~following within the Ramp Up Period, stops~~ fails to achieve a minimum Net Sales of $ ▓▓▓▓▓to pay the Company ▓▓▓▓▓▓▓ USD minimum ~~from~~ Commercially Exploiting such Fully Developed Specified IP ~~for any consecutive six (6) month period~~Contract Year after the Ramp Up Period as defied in the Specified License IP Agreement, the Company shall be entitled to convert the Specified IP License from an exclusive license to a non-exclusive license upon ~~six~~ two (26) months' prior written notice to Investor, with all other terms and obligations under the Specified IP License remaining the same, except for remuneration which shall be adjusted accordingly, per Section 3.2 of the Specified IP License Agreement.  The Parties agree that any failure by Investor to use Commercially Reasonable Efforts to Commercially Exploit the Licensed IP ~~to an extent~~scaled up ~~to an   industrially  viable point  within~~ that is viable ~~industrially within~~~~following~~to an extent that is industrially viable within the Ramp Up Period ~~or to (provided that industrially viable Commercialization is achieved with~~n within the Ram Up Period) achieve a minimum▓▓▓▓▓▓▓▓▓▓▓▓▓ ~~in any Contract Year after the Ramp Up Period~~ shall not be deemed to be a breach of this Agreement or any Specified IP License Agreement.

35.   The 9/9 Draft Exclusivity Agreement defined "Fully Developed IP" as technology within the Specified IP that can be commercialized without further development. This definition was substantively unchanged from the Paul Weiss 2015 version.

36.   It defined "Ramp Up Period" as the period between the effective date of a Specified IP License and the 12-month anniversary thereof. This was unchanged from the 2015 Paul Weiss version.

37.   It defined "Proof of Concept Specified IP" as technology within the Specified IP which still needs to be further developed in order to be commercialized. This defined term was an entirely new addition compared to the 2015 Paul Weiss draft.

38.     On September 10, 2016, Chen sent Witmer an email attaching an unexecuted memorandum of understanding (the "9/10 Draft MOU"), which contained an item 1 that was identical to item 1 of the 9/9 Draft MOU sent by You to Garavagno the day prior. *See supra* ¶ 31.

39.     On September 12, 2016, Witmer emailed Chen, stating, "[T]he MOU under discussion between Holly and Roberto still needs some further work . . . ." *See supra* ¶ 8. The email attached a draft term sheet (the "9/12 Draft Term Sheet"), which contained a Key Term Two addressing IP exclusivity.

40.     Key Term Two of the 9/12 Draft Term Sheet addressed similar issues to a clause contained in item 1 of the 9/9 Draft MOU (*see supra* ¶ 31), which as noted above was identical to item 1 of the 9/10 Draft MOU (*see supra* ¶ 37). The two provisions are shown side-by-side below:

| IP exclusivity clause of 9/9 Draft MOU: | Key Term Two of 9/12 Draft Term Sheet: |
| --- | --- |
| Conagen will provide Givaudan with exclusivity to Conagen's Specified IP (either in concept or mature) for F&F for 12 months, which will convert to non-exclusivity should Givaudan fail to scale up to an industrially viable extent within such 12 months. | Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use commercially reasonable efforts to commercially exploit mature IP, or develop concept IP, within 12 months from it being licensed to Givaudan. |

41.     The changes between the exclusivity language in Item 1 of the 9/9 Draft MOU and Key Term Two of the 9/12 Draft Term Sheet are shown below, with additions show as bolded underlined text and deletions shown as bolded struck-through text:

> Conagen will provide Givaudan with exclusivity to Conagen's **specified** ~~**Specified**~~ IP **(including sweeteners)** ~~(~~either in concept or mature~~)~~ for F&F ~~**for 12 months,**~~**,** ~~**which**~~ **Exclusivity** will convert to non-exclusivity should Givaudan fail to ~~**scale up to an industrially viable extent**~~ **use commercially reasonable efforts to**

10

**commercially exploit mature IP, or develop concept IP,** within ~~such~~ 12 months **from it being licensed to Givaudan**.

42.     Key Term Two of the 9/12 Draft Term Sheet is shown side-by-side below with

Key Term Two of the executed Term Sheet:

| Key Term Two of 9/12 Draft Term Sheet: | Key Term Two of executed Term Sheet: |
|---|---|
| Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use commercially reasonable efforts to commercially exploit mature IP, or develop concept IP, within 12 months from it being licensed to Givaudan. | Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to Givaudan. |

43.     The changes between the Key Term Two of the 9/12 Draft Term Sheet and Key

Term Two of the executed Term Sheet are shown below, with additions show as bolded

underlined text and deletions shown as bolded struck-through text:

> Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use commercially reasonable efforts to commercially exploit mature IP, ~~or develop concept IP~~ **to an industrially viable extent**, within 12 months from it being licensed to Givaudan.

44.     On September 26, 2016, Garavagno sent You a redlined version of the Draft SPA,

stating, "The purchase agreement shows a decent amount of redlining, but it primarily reflects a

simultaneous sign and close of the SPA and the simultaneous signing of the non-competes and

exclusivity agreement." He further asked, "Please also send us the exclusivity and license

agreement. We would not expect many changes from the documents agreed last year as the

situation hasn't changed substantially."

11

45.     Garavagno testified that he meant the 2015 Paul Weiss drafts by "the documents agreed last year," which had not been executed.

46.     On October 7, 2016, You sent a "mark up response (redlined)" to the Draft SPA. She also stated, "We are working on the rest of the agreement updates and will share as soon as possible."

47.     That same day, Garavagno responded, "I think we are quite close on this agreement," referring to the Draft SPA. He further stated, "Ancillary agreements are also very important and should be agreed as soon as possible. Are there any particular issues as we would not expect significant changes with the drafts agreed last year?"

48.     Once again, Garavagno explained he was referring to the 2015 Paul Weiss drafts.

49.     On October 12, 2016, You sent Garavagno a version of the exclusivity agreement "updated to Oct 2016" (the "10/12 Draft Exclusivity Agreement").

50.     Section 2(b) of the 10/12 Draft Exclusivity Agreement provided:

> (b)  Upon the discovery, invention, development, creation, acquisition, or in-licensing of any Specified IP by the Company or its Affiliates (including BGN), each of the Company and BGN, as applicable, shall grant and does hereby grant to Investor, to the fullest extent of its respective rights therein and for the duration of the term of this Agreement, a worldwide, exclusive(during the term of this Agreement), license to Commercially Exploit the Specified IP in connection with any products or services within the Fields, which license shall be fully-transferable and fully-sublicensable to Investor's Affiliates (the "Specified IP License"). Within a period of thirty (30) days or a reasonable amount of time as mutually agreed by the Company and Investor in writing from the date on which Investor receives the Creation Notice (the "Agreement Period"):

> (i) if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Proof of Concepts Specified IP in the Fields, the Company and Investor shall enter into (x) a research agreement for the Company to further develop the Proof of Concepts Specified IP in the Fields upon Investor's provision of reasonable compensation for the Company's to-date investments in such IP and reasonable funding for further research (the "Proof of Concepts

12

R&D Agreement") for which the research results, including possibly converting Proof of Concepts Specified IP to Fully Developed Specified IP, are to be owned by Investor unless the Parties otherwise agree in writing and (y) a written license agreement in a form substantially similar to that set forth on Exhibit A hereto (the "Specified IP License Agreement"). If, within the Agreement Period, Investor in writing notifies the Company its intent not to conclude or the Parties are unable to agree on the terms and conditions of the Proof of Concepts R&D Agreement, then no Specified IP License Agreement will be concluded and the Company shall have the right perform further research alone or jointly with any other Person(s).

(ii) if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Fully Developed Specified IP in the Fields but not as a result from the Proof of Concepts R&D Agreement, the Company and Investor shall enter into the Specified IP License Agreement in a form substantially similar to that set forth on Exhibit A. If, within the Agreement Period, Investor in writing notifies the Company its intent not to Commercialize such IP as disclosed in the Creation Notice, then no Specified IP License Agreement will be concluded Field and the Company shall have the right to Commercialize such IP or license to other Person (s). Notwithstanding anything herein to the contrary, and as set forth more fully in each Specified IP License Agreement, Investor agrees to use Commercially Reasonable Efforts to Commercially Exploit any Fully Developed Specified IP as a result of Section 2(b)-(i) or Section 2(b)-(ii) above, under the applicable Specified IP License scaled up to an industrially viable extent within the Ramp Up Period; provided, that in the event Investor or its Affiliates fails to Commercially Exploit such Fully Developed Specified IP scaled up to an industrially viable extent within the Ramp Period, the Company shall be entitled to convert the Specified IP License from an exclusive license to a non-exclusive license upon two (2) months' prior written notice to Investor, with all other terms and obligations under the Specified IP License remaining the same, except for remuneration which shall be adjusted accordingly per Section 3.2 of the Specified IP License Agreement. The Parties agree that any failure by Investor to use Commercially Reasonable Efforts to Commercially Exploit the Licensed IP scaled up to an industrially viable extent within the Ramp Up Period shall not be deemed to be a breach of this Agreement or any Specified IP License Agreement.

51.     As between the 9/9 Draft Exclusivity Agreement and the 10/12 Draft Exclusivity Agreement, the only differences to Section 2(b) are:

(i) The following language is removed from Section 2(b)(i) of the 10/12 Draft Exclusivity

Agreement:

> "The Proof of Concepts R&D Agreement shall provide that, amongst other things, the Company shall have the first right (but not the obligation) to exclusively Commercially Exploit the converted Fully Developed Specified IP at a royalty rate of 10% of the Company's Net Sales world-widely of any products utilizing such converted Fully Developed Specified IP with other reasonable terms and conditions the Parties may agree to in writing;" and

(ii) the following bolded, underlined language is added to, and the following

bolded, struck-through language is deleted from, Section 2(b)(ii):

> Notwithstanding anything herein to the contrary, and as set forth more fully in each Specified IP License Agreement, Investor agrees to use Commercially Reasonable Efforts to Commercially Exploit any Fully Developed Specified IP **as a result of Section 2(b)-(i) or Section 2(b)-ii above**, ~~licensed to it~~ under the applicable Specified IP License scaled up to an **industrially viable** extent ~~that is industrially viable~~ within the Ramp Up Period; provided, that in the event Investor or its Affiliates fails to Commercially Exploit such Fully Developed Specified IP scaled up to an **industrially viable** extent ~~that is viable industrially~~ within the Ramp Period, the Company shall be entitled to convert the Specified IP License from an exclusive license to a non-exclusive license upon two (2) months' prior written notice to Investor, with all other terms and obligations under the Specified IP License remaining the same, except for remuneration which shall be adjusted accordingly per Section 3.2 of the Specified IP License Agreement. The Parties agree that any failure by Investor to use Commercially Reasonable Efforts to Commercially Exploit the Licensed IP to an **industrially viable** extent ~~that is industrially viable~~ within the Ramp Up Period shall not be deemed to be a breach of this Agreement or any Specified IP License Agreement.

Aside from those differences, Section 2(b) is the same between the 9/9 Draft Exclusivity

Agreement and the 10/12 Draft Exclusivity Agreement.

    52.    Garavagno responded on October 28, 2016, with revised versions of the draft

agreements, rejecting certain language concerning development of "Proof of Concept"

technology. *See supra* ¶ 12.

53.     The draft Exclusivity Agreement Garavagno attached (the "10/28 Draft

Exclusivity Agreement") showed Givaudan's markup to Section 2(b) of the 10/12 Draft

Exclusivity Agreement in relevant part as shown below:

> (b)     Upon the discovery, invention, development, creation, acquisition, or in-licensing of any Specified IP by the Company or its Affiliates (including BGN), each of the Company and BGN, as applicable, shall grant and does hereby grant to Investor, to the fullest extent of its respective rights therein and for the duration of the term of this Agreement, a worldwide, exclusive**, irrevocable** (during the term of this Agreement), license to Commercially Exploit the Specified IP in connection with any products or services within the Fields, which license shall be fully-transferable and fully-sublicensable to Investor's Affiliates (the "<u>Specified IP License</u>").  Within a period of thirty (30) days or a reasonable amount of time as mutually agreed by the Company and Investor in writing~~:~~ from the date on which Investor receives the Creation Notice (the "<u>Agreement Period</u>")~~:~~
>
> (i)     ~~if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Proof of Concepts Specified IP in the Fields,~~ the Company and Investor shall enter into ~~(x) a research agreement for the Company to further develop the Proof of Concepts Specified IP in the Fields upon Investor's provision of reasonable compensation for the Company's to date investments in such IP and reasonable funding for further research (the "Proof of Concepts R&D Agreement") for which the research results, including possibly converting Proof of Concepts Specified IP to Fully Developed Specified IP, are to be owned by Investor unless the Parties otherwise agree in writing and (y) a written license~~**a written** agreement in a form substantially similar to that set forth on <u>Exhibit A</u> hereto (the "<u>Specified IP License Agreement</u>").
>
> ~~If, within the Agreement Period, Investor in writing notifies the Company its intent not to conclude or the Parties are unable to agree on the terms and conditions of the Proof of Concepts R&D Agreement, then no Specified IP License Agreement will be concluded and the Company shall have the right perform further research alone or jointly with any other Person(s).~~
>
> (ii)     ~~if the Specified IP in the Fields disclosed in the Creation Notice is identified by the Company as Fully Developed Specified IP in the Fields but not as a result from the Proof of Concepts R&D Agreement, the Company and Investor shall enter into the Specified IP License Agreement in a form substantially similar to that set forth on Exhibit~~
>
> ~~A. If, within the Agreement Period, Investor in writing notifies the Company its intent not to Commercialize such IP as disclosed in the Creation Notice,  then no Specified IP License Agreement will be concluded Field and the Company shall have the right to Commercialize such IP or license to other Person (s).~~

Notwithstanding anything herein to the contrary, and as set forth more fully in each Specified IP License Agreement, Investor agrees to use Commercially Reasonable Efforts to Commercially Exploit any Fully Developed Specified IP ~~as a result of Section 2(b) (i) or Section 2(b) (ii) above.~~**licensed to it** under the applicable Specified IP License ~~sealed up to an industrially viable extent within~~**following** the Ramp Up Period; provided, that in the event Investor or its Affiliates **(i)** fails to **use Commercially Reasonable Efforts to** Commercially Exploit such Fully Developed Specified IP ~~sealed up to an industrially viable extent within the Ramp Period~~**, or (ii) where such** **Fully Developed Specified IP is** **Commercially Exploited by Investor or its Affiliates** **following the Ramp Up Period, stops** **Commercially Exploiting such** Fully Developed Specified IP for any consecutive six (6) month period. the Company shall be entitled to convert the Specified IP License from an exclusive license to a non-exclusive license upon ~~two~~**six** (~~26~~) months' prior written notice to Investor, with all other terms and obligations under the Specified IP License remaining the same, except for remuneration which shall be adjusted accordingly per Section 3.2 of the Specified IP License Agreement.  The Parties agree that any failure by Investor to use Commercially Reasonable Efforts to Commercially Exploit the Licensed IP ~~sealed up to an industrially viable extent within~~**following** the Ramp Up Period shall not be deemed to be a breach of this Agreement or any Specified IP License Agreement.

### C.  Events Subsequent to Givaudan's June 26, 2017 Demand Letter

54.  On June 30, Chen sent an email in response to Garavagno's transmittal of the June 26, 2017 demand letter (*see supra* ¶ 21) in which Chen stated:

> Hi Roberto, Many thanks for it. Sorry for the delay in response toyour email. I just came back from IFT show . Holly , understood . Please proceed it accordingly. Thanks . Have a good weekend !

55.  Garavagno testified that he understood this message to constitute Conagen's acknowledgement that it would return the $10 million Givaudan had transferred to Conagen.

56.  In July 31, 2017, Garavagno wrote to Chen, with reference to Garavagno's June 26 letter, asking Chen to inform Givaudan "of the expected closing date for (i) return of Givaudan's US$10,000,000 advance . . . ."

57.  Thereafter, Garavagno exchanged correspondence and draft agreements with Conagen concerning return of the $10 million and redemption of Givaudan's initial five-percent position in Conagen, which it had obtained through the SPA.

58.  In these exchanges, Garavagno repeatedly characterized the $10 million as an "advance" or as having been "advanced."

16

59.     One of these exchanges included a draft letter from Givaudan to Mr. Chen, in which reference as made to "the return of Givaudan's US$10,000,000 advance to Conagen (the 'Advance')."

60.     This same exchange included a draft "Repurchase and Repayment Agreement," which stated "WHEREAS, in September, 2016, Givaudan advanced US$10,000,000 to [Conagen] (the Advance') in anticipation of entering into certain intellectual property agreements and investing such funds in additional equity of the Company . . . ."

61.     You provided certain markup and commentary on the draft letter and on the "Repurchase and Repayment Agreement," but she did not comment or mark-up the references to the "Advance" in the draft letter or the "Repurchase and Repayment Agreement."

62.     On January 24, 2018, Garavagno sent a letter to Chen setting forth terms Givaudan offered as to redemption of the 2015 investment and "the return of Givaudan's mUS$10,000,000 advance to Conagen (the 'Advance')."

63.     You responded to the letter the following day taking issue with certain aspects of the terms Givaudan offered but not disputing the characterization of the $10 million payment as an advance.

64.     Until this litigation began, Conagen never represented to Givaudan that it considered the Term Sheet Payment anything but an advance or disputed Givaudan's right to return of the Term Sheet Payment.

## CONCLUSIONS OF LAW

65.     As a threshold matter, Key Term 6 of the Term Sheet, by its reference to the BGN Tech LLC Agreement, provides for application of Delaware substantive law to the disputes in this matter. Both parties and the Court have applied Delaware law throughout the action, and the Court continues to do so here.

66.     Givaudan brought suit for return of the $10 million under theories of breach of contract, promissory estoppel, unjust enrichment, money had and received, and conversion. Prior motion practice has narrowed Givaudan's causes of action to breach of contract, promissory estoppel, and unjust enrichment. The Court addresses each in turn.

### A.     Breach of Contract

67.     Where "commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of [Delaware], in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree." *Certainteed Corp. v. Celotex Corp*., 2005 Del. Ch. LEXIS 11, at *57 (Del. Ch. Jan. 24, 2005). Contracting "parties must have reached agreement on all material terms before an agreement to agree will be enforced." *Ramone v. Lang*, Del. Ch. LEXIS 71, at *46 n.56 (Del. Ch. Apr. 3, 2006) (citation omitted).

68.     Under Delaware law, however, "an express contractual obligation to negotiate in good faith is binding on the contracting parties." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 344 (Del. 2013). "[A] party to that agreement may demand that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms." *Id.* at 345.

69.     Insisting on "conditions that do not conform to the preliminary agreement" under circumstances evidencing "the conscious doing of a wrong because of dishonest purpose or moral obliquity" constitutes a breach of the duty. *Id.* at 345. Attempting to obtain and insisting on terms more favorable than those set forth in the parties' term sheet may constitute such a breach. *Id.* at 346-47.

70.     Generally, Delaware courts interpret contracts using the "objective theory," meaning, "contracts are given the interpretation that an objective, reasonable third-party would

assign to them." *Whittington v. Dragon Grp., L.L.C.*, 2011 Del. Ch. LEXIS 63, at *36 (Del. Ch. Apr. 15, 2011) (citations omitted). "The primary goal of contract interpretation is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2019 Del. Ch. LEXIS 1380, at *20 (Del. Ch. Dec. 4, 2019) (quoting *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 14 (Del. Ch. 2003)) (internal quotation omitted).

71.     "If, on its face, the contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity." *Greenstar*, 2019 Del. Ch. LEXIS 1380, at *20. Delaware courts would only resort to extrinsic evidence to ascertain the meaning of a contract if it is ambiguous. *Carlson v. Hallinan*, 925 A.2d 506, 527 (Del. Ch. 2006).

72.     Givaudan asserts that Conagen failed to negotiate in good faith by insisting on IP exclusivity terms that were materially different from those in the Term Sheet.

73.     Specifically, Givaudan argues that Conagen's proposal of terms requiring Givaudan to develop proof of concept technologies in order to maintain its exclusivity was a material departure from the language in Key Term Two of the Term Sheet, which only required Givaudan to "use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to Givaudan."

74.     Because Key Term Two contains multiple undefined terms and the provision that the to-be-negotiated agreements "will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties," Key Term Two is ambiguous.

75.     As such, the Court turns to extrinsic evidence to determine whether Key Term Two embodies a mutually agreed material term from which Conagen's proposal deviated.

76.     The relevant extrinsic evidence on the issue – that is, what the parties' meant by Key Term Two of the executed Term Sheet – consists of the parties' written exchanges between September 9, 2016 through October 26, 2016, and the draft documents transmitted through those exchanges: the 9/9 Draft MOU, the 9/9 Draft Exclusivity Agreement, the 9/10 Draft MOU, the 9/12 Draft Term Sheet, 10/12 Draft Exclusivity Agreement, and the 10/28 Draft Exclusivity Agreement.

77.     As recited above, Section 2(b)(i) of the 9/9 Draft Exclusivity Agreement provided that, if the "Specified IP" included "Proof of Concepts Specified IP," Givaudan would have the option to engage Conagen to develop the Proof of Concepts Specified IP for the possible conversion of it to "Fully Developed Specified IP," and if it declined such option, "then no Specified IP License Agreement will be concluded and the Company shall have the right [to] perform further research alone or jointly with any other Person(s)." *See supra* ¶ 33.

78.     The Court finds this Section 2(b)(i) language was what You referred to in her transmittal email as the addition of "Givaudan's first right to engage Conagen for push concepts to commercialization ready (fully developed IP)." *See supra* ¶ 32.

79.     In plain terms, Conagen's proposal under Section 2(b)(i) of the 9/9 Draft Exclusivity Agreement was that Givaudan would have the option to engage Conagen to develop "Proof of Concepts Specified IP" (defined as IP requiring further development before commercialization) (*see supra* ¶ 36), and if it chose not to, Conagen would be free to develop such IP itself or in partnership with others.

80.     Section 2(b)(ii) of the 9/9 Draft Exclusivity Agreement required Givaudan to use "Commercially Reasonable Efforts to Commercially Exploit any Fully Developed Specified IP licensed to it under the applicable Specified IP License scaled up to an extent that is industrially viable with the Ramp Up Period," and that if Givaudan failed to do so, Conagen would be entitled "to convert the Specified IP License from an exclusive license to a non-exclusive license . . . ." *See supra* ¶ 33 (emphasis added).

81.     The Court finds this Section 2(b)(ii) language was what You referred to in her email when she said, "[T]he goal should be commercialization to scaled up to an industrially viable point. Failure to achieve such goal within such 12 months will result in conversion to non-exclusive license." *See supra* ¶ 32.

82.     Taken together, You's email and Sections 2(b)(i) and (ii) of the 9/9 Draft Exclusivity Agreement are consistent with the IP exclusivity term of the 9/9 Draft MOU:

> Conagen will provide Givaudan with exclusivity to Conagen's Specified IP (***either in concept or mature***) for F&F for 12 months, which will convert to non-exclusivity should Givaudan fail to scale up to an industrially viable extent within such 12 months.

*See supra* ¶ 31 (emphasis added).

83.     Relatedly, the Court finds the term "concept" in the 9/9 Draft MOU was equivalent to the defined term "Proof of Concepts Specified IP" in the 9/9 Draft Exclusivity Agreement, and the term "mature" in the Draft MOU was equivalent to the defined term "Fully Developed Specified IP" in the 9/9 Draft Exclusivity Agreement. *See supra* ¶¶ 34, 36.

84.     When Givaudan sent the 9/12 Draft Term Sheet, however, the included IP exclusivity term was materially different from that of the 9/9 Draft MOU in that it set the standard for conversion from exclusivity to non-exclusivity as the failure to "to use

21

33224622.v1

commercially reasonable efforts to commercially exploit mature IP, or develop concept IP" as distinct from the failure "to scale up to an industrially viable extent." *See supra* ¶ 39.

85.     Further still, the IP exclusivity term of the executed Term Sheet (*i.e.*, Key Term Two) was materially different from that of the 9/12 Draft Term Sheet. By striking the clause "or develop concept IP" (*see supra* ¶¶ 41-42), **Key Term Two of the executed Term Sheet did away entirely with any obligation on Givaudan's part as to developing Proof of Concepts Specified IP**. *See supra* ¶¶ 75-78, 80-81.

86.     As such, the Court finds that Key Term Two embodied the parties' intent to negotiate toward IP exclusivity agreement that would only require Givaudan to expend efforts with respect to "mature IP," or "Fully Developed Specified IP," in order to maintain exclusivity.

87.     When You sent the 10/12 Draft Exclusivity Agreement, however, Section 2(b)(i) was included in essentially the same form as it had been in the 9/9 Draft Exclusivity Agreement. *See supra* ¶¶ 49-50.

88.     In other words, Conagen's proposal in the form of the 10/12 Draft Exclusivity Agreement represented a reversion to the pre-Term Sheet IP exclusivity concept, which additionally required Givaudan to expend efforts to develop "concept IP," or "Proof of Concepts Specified IP," in order to maintain exclusivity.

89.     As a result, the Court finds that Conagen indeed proposed an IP exclusivity term that was materially different from Key Term Two of the executed Term Sheet.

90.     In addition, the Court finds that Conagen, by way of You's undisputed admission, proposed this materially different term because of Givaudan's decision not to invest in Chen's other companies, Sweegen and Anhui (*see supra* ¶¶ 15-16), which decision came after the parties "separately" discussed such additional investments as expressly contemplated by Key Term 4.

As an attempt to obtain more favorable terms than the parties contemplated in the Term Sheet, this constitutes a breach of Conagen's duty to negotiate in good faith under the Term Sheet under controlling law. *See SIGA Techs.,* 67 A.3d at 344-46 (Del. 2013).

91.     For its damages based on Conagen's breach of contract, Givaudan seeks return of the $10 million it transmitted to Conagen after the parties executed the Term Sheet. It seeks no expectancy damages.

92.     Givaudan is entitled to this amount as reliance damages, "measured by its actually-incurred costs and expenses" in reliance on Conagen's promise to negotiate toward an IP exclusivity term consistent with Key Term Two of the executed Term Sheet. *See SIGA Techs.,* 67 A.3d at 348-50 (Del. 2013).

**B.     Promissory Estoppel**

93.     "Under the doctrine of promissory estoppel, a plaintiff must demonstrate by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

94.     "Promissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue." *SIGA*, 67 A.3d at 348.

95.     Because the Court finds the Term Sheet embodied an agreement to negotiate in good faith toward, among other things, an IP exclusivity term that required Givaudan only "to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to Givaudan," the Court finds that Givaudan does not have a claim for promissory estoppel.

96.     If, however, the Court were to find that the Term Sheet were not a fully integrated, enforceable agreement to negotiate toward all the Key Terms in good faith, it would then find that Conagen at least promised to negotiate in good faith toward IP exclusivity terms similar to Key Term Two. *See supra* ¶¶ 74-90.

97.     It would further find that it was reasonable expectation of Conagen that such promise would induce Givaudan to make a payment of $10 million based on Witmer's representation in his September 12, 2016 email, in which he stated, "In order to show our commitment I am perfectly happy to sign a term sheet on Conagen as per the attachment together with you when we meet next Thursday in San Francisco and to effect the additional equity payment for Conagen immediately." *See supra* ¶ 8.

98.     The Court would further find Givaudan reasonably relied on Conagen's promise by transmitting the $10 million payment to Conagen after the Term Sheet was signed.

99.     Because reliance damages are an appropriate remedy for promissory estoppel, the Court would find in this liability scenario that Givaudan is entitled to repayment of the $10 million it transferred to Conagen in reliance on its promises. *See Harmon v. Del. Harness Racing Comm'n,* 62 A.3d 1198, 1202 (Del. 2013) ("Reliance damages are intended to assure that those who are reasonably induced to take injurious action in reliance upon the non-contractual promises receive recompense for that harm . . . .") (citations omitted).

### C.     Unjust Enrichment

100.    The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

101.    "Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract." *Id.*

102.    For the same reasons as the Court finds a promissory estoppel claim does not lie, it likewise finds that an unjust enrichment claim does not lie.

103.    However, if the Court were to find no enforceable agreement to agree (or no breach thereof), and it were to find that Givaudan could not establish entitlement to $10 million in damages through promissory estoppel, it would find an absence of remedy provided at law and then consider Givaudan's cause of action for unjust enrichment.

104.    The Court would find a clear enrichment of Conagen and impoverishment of Givaudan in the transfer of $10 million following execution of the Term Sheet. The question for the Court, then, would be whether there was any justification for Conagen to retain the $10 million payment.

105.    Conagen has asserted the justification that it granted an additional 5% equity stake in exchange for $10 million, constituting a fully performed, no-strings-attached agreement to sell Givaudan stock.

106.    This purported justification is not credible in light of the facts of this case.

107.    You's first email to Garavagno on September 9, 2016 presented a "COMPLETE package of all documents" including drafts of the SPA, Exclusivity Agreement, and non-competes, among others. It also included the 9/9 Draft MOU, which presented Givaudan's prospective equity investment in item 1 along with the non-competes, corporate governance changes, and IP exclusivity. *See supra* ¶¶ 27, 30-31.

108.    Chen sent Witmer a similar if not identical draft MOU a day later presenting all such terms as item 1. *See supra* ¶ 37.

25

109.    When Garavagno provided feedback to You on September 26, 2016 to the Draft SPA, he provided the context that his changes "primarily reflect[ed] a simultaneous sign and close of the SPR and the simultaneous singing of the non-competes and exclusivity agreement." *See supra* ¶ 43.

110.    When You sent Garavagno stock certificates in May 2017, Garavagno replied that Givaudan's prospective investment was "very clearly linked to these IP deals, which for the moment, are still not completed." *See supra* ¶ 18. There is no evidence that You or anyone else on Conagen's half disputed this position at the time.

111.    Similarly, when Garavagno wrote on June 26, 2017 that Givaudan rejected "the purported issuance of equity" without agreement on the IP rights (*see supra* ¶ 21), neither You nor anyone else object to Garavagno's characterization or asserted that the parties had completed a stock purchase-sale by Givaudan's 2016 payment.

112.    Furthermore, throughout the parties' exchange of proposals to unwind their relationship between June 2017 and January 2018, in which Garavagno repeatedly distinguished between "return" of the "advance" and "repurchase" of Givaudan's shares obtained through the 2015 SPA, neither You, Chen nor anyone else on Conagen's behalf argued that the parties had completed a stock purchase-sale. *See supra* ¶¶ 53-63.

113.    All of this evidence supports Givaudan's interpretation of events that the $10 million payment was an advance contingent on closure of deals incorporating the stock purchase, corporate governance changes, non-competes, and IP exclusivity terms.

114.    The evidence Conagen relies on to the contrary is limited to (i) the Givaudan board presentation that states its purchase of an additional 5% stake of Conagen in the past tense

(*see supra* ¶ 22), and (ii) the December 1, 2016 email in which Mauricio Graber of Givaudan stated "Givaudan is a 10 percent equity investor of Conagen" (*see supra* ¶ 17).

115.    As to the former item, Thoen credibly testified that he stated Givaudan's investment in the past tense based on his assumption the deal would close, and that he included the other aspects of the Term Sheet Key Terms in the same slide based on their presumed interdependency. *See supra* ¶¶ 25-26.

116.    Similarly, the latter item included the statement that the parties needed to discuss "right of first refusal versus exclusivity" (*see supra* ¶ 17), which in the context of the extensive exchange of IP exclusivity terms recited above (*see supra* ¶¶ 27-52) also suggests that the stock purchase was contingent on other agreements.

117.    In addition, it is undisputed that Conagen never carried out the aspects of Key Term 1 aside from the payment of $10 million relating to the adjustment of its management structure and securing confidentiality and non-competition agreements from Oliver Yu and Steven Chen. *See supra* ¶¶ 10, 106.

118.    On balance, and taking into account the Court's credibility determinations, the evidence demonstrates conclusively that the parties did not intend or understand Givaudan's transfer of $10 million to be a fully performed stock purchase-sale.

119.    As such, there is no justification for Conagen to retain this amount, and therefore, in the liability scenario in which the Court might consider Givaudan's cause of action for unjust enrichment, the Court would find Givaudan entitled to damages in the amount of $10 million, plus interest.

**D.    Interest**

120.    As to interest, it is well-settled that state law applies to an award of prejudgment interest in a diversity action in federal court. *Schipani v. McLeod*, 541 F.3d 158 (2d Cir. 2008).

27

Delaware law provides that "prejudgment interest is awarded as a matter of right." *CIGNEX Datamatics, Inc. v. Lam Research Corp.*, No. 17-320 (MN), 2021 U.S. Dist. LEXIS 10771 (D. Del. Jan. 21, 2021); *see also Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482 (Del. 2011).

121.    "Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve Discount Rate including any surcharge as of the time from which interest is due." Del. Code Ann. tit. 6, § 2301.

122.    As there is no expressed contract rate in this case, the Court may take judicial notice that the Federal Reserve Discount Rate fluctuated between the date Plaintiff demanded return of the $10 million payment (June 26, 2017) and the date of Plaintiff's proposed findings of fact and conclusions of law as follows:

- June 26, 2017 through December 13, 2017: 1.75%[1]

- December 14, 2017 through March 21, 2018: 2.00%[2]

- March 22, 2018 through June 13, 2018: 2.25%[3]

- June 14, 2018 through September 26, 2018: 2.50%[4]

- September 27, 2018 through December 19, 2018: 2.75%[5]

- December 20, 2018 through July 31, 2019: 3.00%[6]

---

[1] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20170711a1.pdf (last visited April 25, 2022).
[2] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20180109a1.pdf (last visited April 25, 2022).
[3] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20180417a1.pdf (last visited April 25, 2022).
[4] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20180710a1.pdf (last visited April 25, 2022).
[5] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20181023a1.pdf (last visited April 25, 2022).
[6] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20190115a1.pdf (last visited April 25, 2022).

- August 1, 2019 through September 18, 2019: 2.75%[7]

- September 19, 2019 through October 30, 2019: 2.50%[8]

- October 31, 2019 through March 3, 2020: 2.25%[9]

- March 4, 2020 through March 15, 2020: 1.75%[10]

- March 16, 2020 through March 16, 2022: 0.25%[11]

- March 17, 2022 through April 29, 2022: 0.50%[12]

123.    Based on these historical interest rates, interest from June 26, 2017 through the date of this submission is calculated as $3,134,657.53, which amount shall be updated and finalized based on the prevailing Federal Reserve Discount Rate from the date of Plaintiff's proposed findings of fact and conclusions of law through the date of judgment.

---

[7] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20190827a1.pdf (last visited April 25, 2022).

[8] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20191015a1.pdf (last visited April 25, 2022).

[9] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20191126a1.pdf (last visited April 25, 2022).

[10] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20200417a1.pdf (last visited April 25, 2022).

[11] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20200417a1.pdf (last visited April 25, 2022).

[12] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20220412a1.pdf (last visited April 25, 2022).

33224622.v1

Dated:     April 29, 2022
              Buffalo, New York

GOLDBERG SEGALLA LLP

By:   /s Ryan Pitman
       Christopher J. Belter
       Ryan G. Pitman
       *Attorneys for Plaintiff*
       *Givaudan SA*
       665 Main Street
       Buffalo, New York 14203-1425
       Phone: 716.566.5400
       Fax:   716.566.5401
       cbelter@goldbergsegalla.com
       rpitman@goldbergsegalla.com

30