UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GIVAUDAN SA,

                    Plaintiff,

          - against -

CONAGEN INC.,

                    Defendant.

---

18-cv-3588 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff Givaudan SA ("Givaudan") brought this action against Conagen Inc. ("Conagen") alleging breach of contract, promissory estoppel, and unjust enrichment as a result of a $10 million payment by Givaudan to Conagen in September 2016. Conagen claims that the payment was made for a 5% investment in Conagen, evidence of which was eventually produced to Givaudan. Givaudan claims that the $10 million payment was only an advance pursuant to a letter of intent that contained other conditions and that Conagen failed to satisfy the other conditions and failed to negotiate in good faith and should not be permitted to retain that $10 million advance. The Court held a non-jury trial on June 6, 7, 8, and 15, 2022, in this case and the companion case of Phyto Tech Corp. v. Givaudan SA, 18-cv-6172 (S.D.N.Y. filed July 7, 2018). Having reviewed the evidence and assessed the credibility of the witnesses, the Court now makes the following Findings of Fact and reaches the following Conclusions of Law. To the extent relevant,

1

the Court also incorporates the Findings of Fact in the companion case.

## FINDINGS OF FACT

### I. Background

1.    Givaudan is a company organized under the laws of Switzerland. Givaudan is one of the world's largest manufacturers of flavors, fragrances, and active cosmetic ingredients. ECF No. 121 at 10.

2.    Conagen, a Massachusetts corporation with a principal place of business in Massachusetts, is in the business of researching and developing bio-manufacturing processes and techniques. ECF No. 121 at 10-11.

3.    Juerg Witmer is the former chairman of the board of directors for Givaudan until he retired in March 2017. ECF No. 121 at 11.

4.    Christian Thoen is the former Head of Science and Technology for the Flavors Division of Givaudan. Tr. 34.

5.    Roberto Garavagno is in-house general group legal counsel for Givaudan. Tr. 49, 449.

6.    Steven Chen is the president of Conagen. Tr. 239.

7.    Holly You served as in-house legal counsel for Conagen. Tr. 49.

8.    The relationship between Givaudan and Chen began sometime prior to 2014 with Conagen affiliate Phyto Tech Corp. d/b/a Blue California ("Blue Cal") supplying a sweetener product to Givaudan. See Tr. 242-43.

9.    In 2014, Blue Cal and Givaudan entered into a joint venture known as BGN Tech LLC as embodied by an operating agreement (the "BGN LLC Agreement"). DX-49.

10.    Thoen was appointed as one of two Givaudan-appointed BGN board members. Blue Cal appointed the other three board members. Tr. 37.

11.    Between 2014 and 2015, Givaudan and Conagen discussed a potential investment by Givaudan in Conagen. Tr. 40.

## II. Givaudan's Investment in Conagen

12.    Following the formation of BGN, Givaudan made a direct investment in Conagen. On July 3, 2015, Conagen and Givaudan entered into a stock purchase agreement under which Givaudan invested $10 million in Conagen in exchange for a five-percent equity interest in the company. DX-12. Givaudan was represented by Paul Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and Conagen was represented by Armstrong Teasdale LLP. Tr. 457; Tr. 304. While the parties discussed future potential investments and licensing terms, the July 2015 agreement did not bind the parties to any further agreements and was a

straightforward money-for-equity transaction. See Tr. 452-53, 474-75; Tr. 41; DX-12 § 8.11.

13.   Section 8.11 of the July 2015 Stock Purchase Agreement provides specifically: "This Agreement, along with the Schedules and Disclosure Schedule hereto, together contain the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters."[1] DX-12 § 8.11. There is no request in this case for the return of the July 2015 investment that Givaudan made in Conagen.

**III. Negotiations Leading to the September 15, 2016 Term Sheet**

14.   Following the July 2015 investment, the parties discussed the terms under which Givaudan might make additional investments in Conagen and companies related to Conagen such as SweeGen International Limited ("SweeGen") and Anhui Longjin Bio-Technology Co., Ltd. ("Anhui"). Mr. Chen had such discussions with Dr. Thoen, Dr. Juerg Witmer (the Chairman of Givaudan) and Mr. Garavagno. DX-01; DX-13; Tr. 43-44. Mr. Chen was interested in implementing what he called the "three-pillar" concept in which Givaudan would make investments in all three companies. Tr. 248-49.

---

[1] Unless otherwise specified, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

15.   In early September 2016, Mr. Chen travelled to
Switzerland at Dr. Witmer's invitation to attend the 50th
anniversary party of Givaudan. DX-1; Tr. 247-48. At the end of
that week, on Friday, September 9, 2016, Holly You, in-house
counsel for the Blue Cal group of companies, sent to Garavagno a
set of agreements, which she referred to as "the COMPLETE
package of all documents updated from Paul Weiss' 2015 set of
drafts." DX-22. These documents included a draft memorandum of
understanding, DX-23; a draft common stock purchase agreement,
DX-24; a draft Conagen officer's certificate, DX-25; a draft
disclosure schedule, DX-26; a draft exclusivity agreement, DX-
27; a draft specified IP license agreement, DX-28; a draft right
of first offer agreement, DX-29; and two draft confidentiality
non-competition, non-solicitation agreements, DX-30, DX-31.
These drafts were mark-ups of earlier drafts provided by Paul
Weiss in October 2015. DX-22, DX-24, Tr. 452.

16.   The Draft Memorandum of Understanding from September
2016 described a three-part investment by Givaudan into Blue
Cal's family of companies: one part to Conagen, one part to
SweeGen, and one part to Anhui. DX-23.

17.   The Draft Memorandum of Understanding provided in Term
1 that Givaudan would invest $10 million for an additional 5% of
Conagen based on a $200 million valuation of Conagen based on
Givaudan's previous investment, that Conagen would adjust its

management structure in certain ways, and that Conagen would

provide Givaudan with "exclusivity to Conagen's Specified IP

(either in concept or mature) for [Flavors and Fragrances] for

12 months, which will convert to non-exclusivity should Givaudan

fail to scale up to an industrially viable extent within such 12

months." In items 2 and 3, the Draft Memorandum of Understanding

provided for investments by Givaudan of $15 million for 5% of

SweeGen and $15 million for a 30% interest in Anhui with

specific details of those investments. DX-23.

18.   On Monday, September 12, 2016, Dr. Witmer sent an

email to Mr. Chen with a cover note confirming a meeting in San

Francisco for later that week. DX-01. He also provided a

revision to Ms. You's Memorandum of Understanding, which she had

sent on September 9, 2016. Dr. Witmer, who is a lawyer, appears

to have revised the agreement himself. Tr. 252; 475; compare DX-

23 with DX-01. It is plain that Dr. Witmer and Mr. Chen had a

mutually cooperative relationship.

19.   Dr. Witmer made a number of important changes to the

draft Memorandum of Understanding, which he named a "term

sheet." With respect to the first term, which governed the

Conagen deal, Dr. Witmer divided out the language relating to

the equity purchase and kept that in Key Term 1. He then placed

the terms relating to "specified IP" in Key Terms 2 and 3.

Compare DX-23 with DX-01. At the same time, he wrote in the

cover email: "In order to show our commitment I am perfectly happy to sign a term sheet on Conagen as per the attachment together with you when we meet next Thursday in San Francisco and to effect the additional equity payment for Conagen immediately." DX-01 (emphasis added). Notably, the first item in the September 12 Term Sheet provided only for a $10 million investment by Givaudan for 5% of Conagen with certain managerial changes at Conagen and confidentiality agreements for Mr. Chen and Oliver Yu, Conagen's Chief Science Officer. There were no agreements with respect to IP in Key Term 1. DX-01.

20.  With respect to SweeGen and Anhui, instead of a detailed set of transaction terms, Dr. Witmer proposed in Key Term 4 to negotiate in good faith over future investments. He also added a preamble section, which made it clear that the parties had substantial flexibility with respect to further negotiations over the IP rights and future investments. Accordingly, the draft states that the parties "envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties." DX-01. The September 12 Term Sheet also contemplated that no subsequent agreements might be executed, using the language "if any" to refer to future agreements. DX-01.

## IV. The September 15, 2016 Term Sheet

21.   On September 15, 2016, Mr. Chen, Ms. You, Dr. Witmer,
Dr. Thoen, and Scott May (Givaudan's Senior Vice President) met
in San Francisco to finalize the Term Sheet. Tr. 248; 395. At
the meeting, Mr. Chen, Dr. Witmer and Dr. Thoen executed the
term sheet (the "Term Sheet") that contains six "Key Terms." DX-
02. The Term Sheet executed on September 15, 2016 is
substantially the same as the Term Sheet prepared by Dr. Witmer
dated September 12, 2016. Compare DX-2 with DX-1. The September
15, 2016 Term Sheet is the key document reflecting Givaudan's
investment of its additional $10 million investment in Conagen.

22.   As proposed in Dr. Witmer's September 12 Term Sheet,
the Preamble of the final Term Sheet states that the agreement
is "in regards to Givaudan taking an equity stake in Conagen."
It also states that "[t]he parties currently envision that they
will negotiate in good faith and enter into one or more
agreements which will contain terms and conditions similar to
those detailed below and other terms and conditions to be
negotiated between the parties." DX-02. The Term Sheet also
provides: "This Term Sheet will be succeeded by the terms and
conditions of the executed agreements, if any." DX-02 (emphasis
added).

23.   Key Terms 1-4 provide:

1.   Givaudan will invest an additional $10 M for an additional 5% of Conagen, based upon a $200 M evaluation from the 2015 Givaudan/Conagen deal. Conagen will adjust its management structure to include legal/finance, CSO and office and regulator managers, and securing confidentiality and non-compete agreements from its CSO Oliver Yu and CEO Steven Chen.

2.   Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to Givaudan. DX-02.

3.   The parties will agree on licensing terms for the commercial exploitation of the specified IP by Givaudan. DX-02.

4.   The parties will discuss in good faith separately whether and at which conditions further investments in Blue California Group companies may be made.

DX-02.

24.   Key Term 6 provided that the law and jurisdiction clauses agreed to in the BGN LLC Agreement would govern. DX-02. Because that agreement incorporates Delaware law, DX-49 at 56, the parties have agreed that Delaware law applies to this dispute.

25.   The Term Sheet was signed on September 15, 2016 in San Francisco by Mr. Chen, Dr. Witmer, and Dr. Thoen. DX-02.

**V. Events Subsequent to Execution of the Term Sheet**

26.   Following execution of the Term Sheet, Givaudan immediately transferred $10 million to Conagen via wire transfer. Tr. 113-14, 311.

27.   While Givaudan now claims that the payment of the $10 million is a reversible "advance," there is no basis to infer that was the mutual intent of the parties at the time the Term Sheet was executed. The Term Sheet makes no reference to an "advance," and it was undisputed at trial that the term "advance" did not come up during the negotiations. Tr. 114. As an experienced businessman and indeed a lawyer, Dr. Witmer was well aware that there was a chance that further negotiations might fail, but he made no provision for return of the $10 million in that eventuality. As Dr. Theon conceded, an objective observer could reasonably conclude from the fact that Givaudan wired the $10 million to Conagen that Givaudan thought the parties had a deal on the second 5% tranche of equity. Tr. 115-16.

28.   Givaudan's internal documents reflect that the $10 million was a payment for equity, not an advance. In an October 2016 slide deck used by Dr. Thoen for a presentation to the Givaudan board of directors, one slide used in the presentation stated:

> This informs the Board on an increase in equity stake in Conagen from 5 to 10% for an additional $10,000,000: Givaudan acquired an initial 5% equity stake in Conagen for a consideration of $10,000,000 on July 3, 2015. The Givaudan's Board of Directors is informed that another 5% stake for $10,000,000 has been acquired."

DX-03 at 2; Tr. 51–52, 116–18. In the same presentation, the
board was informed of an "increase in equity stake in Conagen
from 5 to 10% for an additional $10,000,000 . . . Another 5%
stake for $10,000,000 has been acquired." DX-03 at 9.

29.   The slide presentation describes the 5% equity
interest for an additional $10 million as having been acquired,
although it also described other items: (i) exclusivity for
Givaudan for certain IP, (ii) non-competes from Mr. Chen and Mr.
Yu, and (iii) a position on Conagen's Science Advisory Board.
DX-03 at 9.

30.   On October 12, 2016, Ms. You sent an updated set of
mark-ups of various documents to Roberto Garavagno, reiterating
Conagen's September 9, 2016, positions on IP rights and other
matters. DX-34, DX-35, DX-36, DX-37, DX-38, DX-39. This set of
documents did not include a draft of a stock purchase agreement.
DX-34. There were no significant changes between the draft
exclusivity agreement sent by Ms. You in September 2016 and the
draft sent by Ms. You in October 2016. Tr. 477.

31.   On October 28, 2016, Mr. Garavagno wrote to Ms. You
rejecting Conagen's proposal and claiming that Givaudan was
entitled to exclusivity to all "Concept IP," which Givaudan
understood to mean initial development work still in the lab.
DX-40; Tr. 45. Givaudan did not provide a list of the "specified
IP" to be covered by Key Terms 2 and 3. Tr. 122–23, 250.

Instead, Mr. Garavagno took the position that Givaudan must have exclusivity over even early-stage IP. Conagen offered a right of first refusal with respect to such IP, which would have provided exclusivity, but for which exclusivity would lapse if Givaudan was uninterested in funding further research. Tr. 303; 281.

32.   In early November 2016, Givaudan informed Mr. Chen for the first time that it had no intention of making any equity investments in SweeGen or Anhui. See DX-04.

33.   Givaudan interprets this decision as being a motive for Conagen's alleged intransigence in reaching a decision on terms for Givaudan's exclusivity for Conagen Specified IP. But Givaudan's decision can as easily be read as a failure to comply with Key Term 4 of the Term Sheet that provided: "The parties will discuss in good faith separately whether and at which conditions further investments in Blue California Group companies may be made." DX-02. In any event, Givaudan's decision did not prevent good faith negotiations from proceeding on the issue of Givaudan's access to Conagen's IP. DX-07; DX-08; Tr. 484-86.

34.   On November 7, 2016, Mr. Chen asked Ms. You to stand down in the ongoing negotiations so that he could negotiate directly with the businesspeople on both sides, as opposed to going through the lawyers. Tr. 280-81.

35.   Mr. Chen and Mauricio Graber, a top executive of Givaudan, then continued to negotiate. In late November or early December 2016, Mr. Chen, Mr. Graber, and Dr. Thoen had a phone call about the status of the negotiations. Mr. Chen then sent an email on December 1, 2016, memorializing that call, and Mr. Graber replied confirming that "Givaudan is a 10% equity investor of Conagen" and stating that the parties needed to discuss the "right of first refusal versus exclusivity." DX-08; Tr. 125-26.

36.   Negotiations continued into early 2017. Tr. 485-86. On February 10, 2017, Dr. Thoen emailed Dr. Witmer stating that he "continue[d] to be in constant contact with Steven [Chen]." DX-07. Also in February 2017, Ms. You sent an email to Mr. Garavagno and Dr. Thoen following up on draft agreements related to the Term Sheet. DX-09. At that time, negotiations between the parties were still ongoing. Tr. 486.

37.   On May 10, 2017, Conagen delivered the stock certificates to Givaudan reflecting Givaudan's additional 5% equity interest in Conagen. DX-10. Givaudan received those stock certificates via Federal Express on May 11, 2017 and retains the certificates and the benefit of ownership to this day. Tr. 486, 491.

38.   On May 11, 2017, Mr. Garavagno sent an email to Ms. You purporting to reserve "the right to refuse this second

capital increase." DX-10. Mr. Garavagno's email refers to the second $10 million investment as an "advance." DX-10. Prior to this email from Mr. Garavagno, no document describes the second $10 million investment by Givaudan as an "advance." Tr. 114; 130.

39.  During May and June 2017, Mr. Garavagno took no steps to contact Ms. You, request a negotiation session, or otherwise engage Conagen in negotiations. Tr. 488.

40.  On June 26, 2017, Mr. Garavagno sent a letter breaking off negotiations. He demanded not only a return of the second $10 million investment but "to redeem Givaudan's entire existing 5% interest in Conagen at the initial investment price of US$10,000,000," namely the first $10 million investment. DX-11. Mr. Garavagno made the request even though Conagen had no legal obligation to comply. Tr. 487. He admitted that this constituted a proposal for a new agreement that was different from the Term Sheet. Tr. 487–88.

41.  From July 2017 through November 2017 there followed some posturing between the parties as to whether Conagen was required to return the second $10 million investment. See, e.g., DX-20, DX-47, PTX-73. That back and forth does not change the Term Sheet, the second $10 million investment, or the agreement pursuant to which that second $10 million investment was made,

which was effected in September 2016. The parties never reached any further written agreements. Tr. 53.

42.   Givaudan currently retains stock certificates totaling 10% equity of Conagen, including the stock certificates provided for Givaudan's second $10 million investment. Tr. 129; Tr. 491.

## CONCLUSIONS OF LAW

### I. Givaudan's Count I — Breach of Contract

1.   Under Delaware law, to prove a breach of contract claim, the plaintiff must establish: "(1) the existence of a contract, (2) a breach of the contract, (3) and that the breach of the contract was the proximate cause of damages." Johnson v. Gov't Emps. Ins. Co., No. 06-cv-408, 2014 WL 2708300, at *1 (D. Del. June 16, 2014), aff'd sub nom. Johnson v. GEICO Cas. Co., 672 F. App'x 150 (3d Cir. 2016) (citing VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003)).

2.   The Term Sheet constitutes a contract. The fact that some of the terms required further negotiation does not negate the binding nature of the agreement. Under Delaware law, "an express contractual obligation to negotiate in good faith is binding on the contracting parties." SIGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 344 (Del. 2013).

3.   Key Term 1 describes a cash for equity stock transaction that was performed. Givaudan voluntarily paid $10

million upon execution of the Term Sheet, and Conagen reciprocated by delivering stock certificates evidencing an additional 5% equity interest in Conagen. While Key Term I included certain management changes at Conagen and confidentiality and non-compete agreements from Steven Chen and Oliver Yu, Givaudan has not argued that these agreements were not provided or that the failure to provide any management changes was a material breach of Key Terms.

4.    While Givaudan claims that the $10 million was an "advance," the credible evidence fails to support that argument. There is no language in the Term Sheet referring to an advance and that term was not discussed during the negotiations. Dr. Witmer drafted the relevant language, and as an attorney, he certainly knew how to draft a provision requiring return of the money should negotiations over the IP rights, SweeGen or Anhui prove unsuccessful. Dr. Witmer did not indicate orally or in writing that he viewed the $10 million as an advance, and the Givaudan board was informed that the equity acquisition had been completed by October 2016.

5.    Givaudan argues that the $10 million payment was dependent on the successful conclusion of the negotiation for agreements accomplishing Key Terms 2 and 3 relating to exclusivity for Conagen's specified IP and licensing terms for the commercial exploitation of the specified IP by Givaudan. But

that is not a reasonable interpretation of the Term Sheet. Dr. Witmer specifically separated the IP provisions from Key Term 1 relating to the $10 million payment and the negotiations with respect to the IP provisions had not come close to being finalized when the $10 million was paid. Givaudan also argues that the $10 million was necessarily payment for Conagen's IP, but Key Terms 2 and 3 are more reasonably read as a distinct part of the Term Sheet in which Givaudan would receive rights to IP and would license that IP from Conagen for commercial exploitation. The definiteness of Key Term 1 is to be contrasted with the specifics of Key Terms 2 and 3 which were left to be negotiated in good faith, including the IP that was to be included and the licensing terms that were yet to be determined.

6.   Nor has Conagen breached the requirement to negotiate in good faith in relation to Key Terms 2 and 3. Under Delaware law, proof that a party breached a duty of good faith generally requires demonstrating bad faith. See DV Realty Advisors LLC v. Policemen's Annuity and Benefit Fund of Chi., 75 A.3d 101, 110 (Del. 2013); see also W. Palm Beach Hotel, LLC v. Atlanta Underground, LLC, 626 F. App'x. 37, 42 (3d Cir. 2015) (noting that to breach a duty to negotiate in good faith generally requires "deliberate misconduct, such as reneging on closed contractual terms, imposing unreasonable terms solely in the hope of scuttling a deal, or . . . exploiting a counterparty's

sunk costs"). Bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." SIGA, 67 A.3d at 346.

7.    There is no evidence to support a finding of bad faith on the part of Conagen. Instead, the course of negotiations here shows a reasonable back and forth between Conagen and Givaudan. The parties remained in constant communication into 2017 regarding possible agreements. Tr. 59; DX-07; Tr. 486. It was Givaudan, not Conagen, that broke off negotiations by demanding a return of Givaudan's second $10 million investment, as well as the original $10 million investment paid in 2015, as to which Givaudan had no colorable right. See DX-11; Tr. 487–88.

8.    Conagen's negotiation positions were pursued in good faith. The Term Sheet itself provided significant flexibility to the negotiators, stating that "[t]he parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties." DX-02.

9.    Both before and after the execution of the Term Sheet, Conagen proposed a right of first refusal on "Proof of Concept"

IP, which is a subset of early stage "specified IP." Givaudan never identified the specified IP that would be licensed under Key Terms 2 and 3, making the negotiation rather abstract. Tr. 250, 122. A right of first refusal is a form of exclusivity, which terminates following waiver of the right. Conagen was concerned that it might present a new idea, Givaudan would refuse to fund or develop the idea, but at the same time block Conagen from doing so. Givaudan appears to have been seeking a veto right over new projects, even ones that it had no interest in pursuing on its own. The right of first refusal was a reasonable compromise to resolve the parties' conflicting goals, not an exercise in bad faith negotiation.

10.   Givaudan's claim for breach of contract also fails because Givaudan has failed to prove any damages. "It is well established in Delaware law that expectation damages are the standard remedy for breach of contract." Delaware Exp. Shuttle, Inc. v. Sam Waltz & Assocs. LLC, No. CPU4-10-000005, 2013 WL 3776523, at *3 (Del. Com. Pl. July 1, 2013); see Reserves Dev., LLC v. Crystal Props., LLC, 986 A.2d 362, 367 (Del. 2009) ("In a breach of contract action, we determine plaintiff's damages as if the parties had fully performed the contract.").

11.   Givaudan has expressly disclaimed expectation damages. ECF No. 128 ¶ 91. Instead, Givaudan purports to claim reliance damages, which are "measured by its actually-incurred costs and

expenses." <u>Titan Inv. Fund II, LP v. Freedom Mortg. Corp.</u>, 58 A.3d 984 (Table), 2012 WL 6049157, at *3 (Del. Dec. 5, 2012).

12.   Givaudan has made no showing that it has incurred any costs or expenses. Givaudan presented no evidence that the stock it is holding has diminished in value or that it has incurred any cognizable costs or expenses. In 2015, Givaudan paid $10 million for 5% of the equity of Conagen, and it did the same in 2016. Conagen has not sold stock below that implied $200 million valuation, and at least one subsequent investment in Conagen used a valuation above $200 million. Tr. 252-53. All the evidence shows that Givaudan received fair value for the $10 million that it transferred to Conagen in exchange for the Conagen equity. Givaudan has failed to show that it has incurred any damages from paying $10 million for a 5% interest in Conagen that it continues to hold.

13.   Accordingly, Givaudan has failed to meet its burden to establish the necessary elements, including damages, for its claim of breach of contract. Therefore, Conagen is not liable to Givaudan for breach of contract.

## II. Givaudan's Count II – Promissory Estoppel

14.   The elements of a promissory estoppel claim are that:

> 1) a promise was made; 2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; 3) the promisee reasonably relied on the promise and took action to his or her detriment; and,

4) such promise is binding because injustice can be avoided only by enforcement of the promise.

Fanean v. Rite Aid Corp. of Del., Inc., 984 A.2d 812, 822 (Del. Super. Ct. 2009).

15.   "Promissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue." SIGA, 67 A.3d at 348; TrueBlue, Inc. v. Leeds Equity Partners IV, LP, No. N14C-12-112, 2015 WL 5968726, at *5 (Del. Super. Ct. Sept. 25, 2015); see also Cavi v. Evolving Sys., Inc., No. 15-1211, 2017 WL 658470, at *10 (D. Del. Feb. 17, 2017).

16.   In this case, the Term Sheet, coupled with Dr. Witmer's agreement to transfer immediately the $10 million equity payment, constituted a binding agreement. Key Term 1 governs the exchange of cash for equity. Because there is an enforceable contract governing that promise, there can be no liability under a theory of promissory estoppel. Givaudan cannot use a claim of promissory estoppel to vary the written agreement that the parties executed.

17.   Givaudan's promissory estoppel claim fails for the additional reasons that it cannot show an injury or that injustice can be avoided only by enforcement of the promise. Givaudan retains a valuable 5% interest in Conagen, which was a

fair exchange for its payment. It would be unjust to require Conagen to reverse the equity transaction against its will.

18.   Conagen is not liable to Givaudan under a theory of promissory estoppel.

### III. Givaudan's Count III – Unjust Enrichment

19.   To establish unjust enrichment, Givaudan must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010).

20.   A claim for unjust enrichment is unavailable when there is a contract that governs the parties' relationship. Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 891 (Del. Ch. 2009). As discussed above, the Term Sheet constitutes a contract. Because there is an enforceable contract that governs the promise at issue, there can be no liability under a theory of unjust enrichment.

21.   Moreover, there can be no unjust enrichment here because Givaudan provided no proof that it has been impoverished, much less in the amount of the claimed damages of $10 million. It retains a 5% interest in Conagen, which is a fair exchange for its payment. Givaudan has not been

"impoverished" by the investment, for which it still holds the benefit.

22.   Furthermore, there was ample justification for the exchange. The price paid was fair and reflective of a prior transaction between the parties. Givaudan voluntarily paid the amount and received valuable equity in return. Conagen has every right to retain the proceeds, particularly when Givaudan has held the stock certificates and benefits of ownership for over five years.

23.   Nor is this a proper case for the application of unjust enrichment because there is an adequate remedy at law. Givaudan could have sued under the Term Sheet for damages, and indeed has pleaded a cause of action in Count I for breach of contract, even though that claim was unsuccessful because there was no breach of contract. See, e.g., Intermec IP Corp. v. TransCore, LP, No. 20-cv-3254, 2021 WL 3620435, at *17 (Del. Super. Ct. Aug. 16, 2021).

24.   Conagen is not liable for unjust enrichment. Givaudan's claim for unjust enrichment is dismissed.

## CONCLUSION

Conagen is not liable for Breach of Contract, Promissory Estoppel, or Unjust Enrichment, and thus, Givaudan is entitled to no relief on its claims against Conagen. Givaudan's claims

against Conagen are dismissed. The Clerk is directed to enter
judgment dismissing this case. The Clerk is also directed to
close all pending motions and to close this case.

**SO ORDERED.**
**Dated:**    **New York, New York**
             **July 18, 2022**

                              John G. Koeltl
                    United States District Judge